## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.:  06-309 (HHK)** |
| | : | |
| **v.** | : | |
| | : | **MAG. NO.:** |
| **JOHN GRAY,** | : | |
| | : | |
| | : |  **18 U.S.C. § 641** |
| **Defendant.** | : | **(Theft or Embezzlement of Public Money)** |
| | : | |
| | : | |

## UNITED STATES' MEMORANDUM  IN AID OF
## SENTENCING AND MOTION FOR THREE POINT REDUCTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Memorandum in Aid of Sentencing and Motion for Three Point Reduction, recommending that the defendant be sentenced to 12 months of imprisonment, followed by 2 years of supervised release.  In support thereof, the United States respectfully states the following:

<u>Background</u>

1.      The Spouse Equity Act, codified as amended in various sections of Title 5 of the United States Code, provides annuity benefits for the widows of civil service employees.  5 U.S.C. § 8341.  Ms. Edna Gray was the mother of defendant John C. Gray (the "defendant") and was a civil service survivor annuitant who received an annuity as the widow of John R. Gray, who retired from the U.S. Navy on or about October 31, 1969, and ultimately passed away on or about May 7, 1978.

-1-

Upon Mr. Gray's death, Ms. Edna Gray applied for and was granted a survivor annuity from the Office of Personnel Management ("OPM") Civil Service Retirement System ("CSRS"), the Agency of the United States Government that administers the annuity benefits program. Ms. Gray received her payments by paper checks mailed to her address of 4411 Falls Terrace, S.E., Washington, D.C.

2.     Ms. Edna Gray died on or about October 4, 1984. Her death was noted as a matter of public record by the certificate of death dated on or about October 9, 1984. Under Title 5, United States Code, Section 8341(b)(3), Ms. Gray's annuity was to have terminated at the time of her death.

3.     The defendant maintained a joint account with his mother, which was the same account where his mother's annuity payment checks were deposited. After his mother's death, the defendant continued to receive and deposit the annuity checks into his bank account by forging his mother's signature on each check, and making use of the proceeds of the check once the money was disbursed into his account. Thereafter, from on or about November 1984, until on or about April 2006, when his scheme was discovered, the defendant continued to receive his mother's annuity payments and deposit them into his account. In doing so, he took several affirmative steps to give the appearance that his mother was still alive, including, but not limited to the following:

(a)     completing an OPM missing payment / lost check form, dated June 30, 1986, by forging his mother's signature;

(b)     completing an OPM address verification form sent on or about December 18, 1987, by forging his mother's signature and dating it on January 3, 1988;

(c)     completing a Federal Employees Health Benefits form, by forging his mother's signature on or about March 20, 1989, thereby canceling his mother's health

insurance;

(d)     completing an OPM address verification form sent on or about April 26, 1995, by forging his mother's signature and dating it on or about June 2, 1995.

4.     Effective on or about October 8, 1998, the defendant had his mother's survivor annuity payments deposited electronically to his account with Market USA Federal Credit Union, in Laurel, Maryland, account number 1255524702.

5.     On April 12, 2006, OPM Special Agent Chris Gleason interviewed the defendant at his residence.  The defendant acknowledged that he was the joint holder of the above-mentioned bank accounts and that Edna Gray's annuity payments had been deposited in the accounts.  The defendant admitted to spending his mother's annuity payments.

6.     As a result of the defendant's conduct, OPM continued to pay Ms. Edna Gray's annuity after her death, from on or about November 1, 1984, until on or about April 12, 2006, resulting in the defendant's theft and conversion of $162,303.76 of government money belonging to the United States Office of Personnel Management.

Plea Agreement

7.     To his credit, the defendant accepted responsibility for his conduct at the inception of this case and pled guilty on November 14, 2006, pursuant to the government's plea offer, to a one-count information charging him with Theft of Government Property, in violation Title 18, United States Code, Section 641.  In the plea agreement, the defendant agreed he is accountable for the theft of $162,303.76, and agreed to pay restitution in that amount to the U.S. Office of Personnel Management.  The government agreed not to oppose a three-point reduction in the defendant's total offense level for early acceptance of responsibility or a sentence at the low end of the defendant's

applicable range under the guidelines and policies promulgated by the United States Sentencing Commission, Guidelines Manual (hereinafter "Sentencing Guidelines" or "U.S.S.G."). Consistent with the plea agreement, the government hereby moves the for a three-point reduction in the defendant's total offense level under the Sentencing Guidelines.

Statutory Penalties

8.      Pursuant to Title 18 United States Code, Section 641, the defendant may be sentenced to not more than 10 years imprisonment for theft of government property. In addition, he is subject to a period of supervised release of not more than three years, pursuant to Title 18 United States Code, Section 3583, and a fine up to $250,000, pursuant to Title 18 United States Code, Section 3571. A mandatory assessment of $100 must also be imposed for the felony conviction pursuant to Title 18 United States Code, Section 3013.

Sentencing Guidelines

9.      Under the Sentencing Guidelines, based on the information set forth in the Presentence Investigation Report ("PSR"), the defendant's total offense level is 13. U.S.S.G. §§2B1.1(a)(2), 2B1.1(b)(1)(F) and 3E1.1. The defendant has a criminal history of zero points, placing him in criminal history Category One. U.S.S.G. Chapter 5, Part A. Accordingly, the defendant's applicable range of incarceration is 12 to 18 months of imprisonment. U.S.S.G. Chapter 5, Part A. The Sentencing Guidelines also provide for a period of supervised release of at least two, but not more than three years. U.S.S.G. §5D1.2(a)(2). The fine range under the Sentencing Guidelines is $3,000 to $30,000. U.S.S.G. §5E1.2(c)(3).

Sentencing Recommendation

10.     The government recommends that the defendant be sentenced to 12 months

-4-

incarceration, followed by 2 years of supervised release. The government's recommendation, which falls at the low end of the defendant's applicable Sentencing Guidelines range, is reasonable. In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment. The Court invalidated the statutory provision that made the Guidelines mandatory: Title 18, United States Code, Section 3553(b)(1). Booker, 124 S. Ct. at 764. The Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines. See 18 U.S.C. § 3554(c)(2). The sentence will then be subject to review by courts of appeals for "reasonableness." Booker, 124 S. Ct. at 766.

        11.    In Booker's wake, this Court must continue to resolve disputed questions of fact and law  and correctly calculate a defendant's sentence under the existing Sentencing Guidelines. See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 124 S. Ct. at 767 (citing 18 U.S.C.A. §§ 3553(a)(4)&(5) (Supp. 2004)).   In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se. Not only is a sentence within the Guidelines range presumptively reasonable, but it also accommodates the salutary goal,

endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences. A sentence of 12 months incarceration, within the defendant's Sentencing Guidelines range, satisfies this goal.

12.     A sentence within the Sentencing Guideline range is not only presumptively reasonable for the reasons outlined above, but it is reasonable and appropriate for this defendant based on the facts of this case, when viewed in conjunction with the defendant's criminal history and willingness to accept responsibility at an early stage in the case. The recommended sentence of 12 months imprisonment is also supported by the factors to be considered by courts as articulated in 18 U.S.C. § 3553(a). This provision provides, in pertinent part, that when fashioning a sentence, courts should consider (1) the circumstances surrounding the instant offense and the defendant's criminal history, (2) the seriousness of the offense and the need to promote respect for the law and punishment, (3) potential deterrence, (4) protecting the public, and (5) the rehabilitative needs of the defendant. Id.

13.     Regarding the nature and seriousness of the offense, the defendant stole over $162,303 from the United States government over the course of 21 years and 6 months, for an average of $7,549 per year over 21 years. The defendant attempts to minimize his culpability by stating to the PSR writer that he was spending the money on his children's education, rather than on frivolous items. A review of the check records since the beginning of 1998 from the defendant's Market Credit Union bank account reveals that the defendant spent approximately $10,593.53 on education expenses at St. Francis de Sales School, Prince George Community College, Elizabeth Seton High School and Bethune-Cookman College. According to the PSR, the defendant received an associate's degree from Prince George Community College in 2002. Of the $10,593.53, the total

amount of education payments to Prince George Community College was $3,067 from September 7, 1999, to January 9, 2002. The difference of $7,526.53 is the amount the defendant spent on his children's education since January 1998. In that same time period, the defendant stole $76,088 from the United States by cashing his mother's annuity checks. Contrary to the impression the defendant tried to give in his statement to the PSR writer, the defendant apparently spent less than ten percent of the stolen money on his children's education.[1]

14.     Making the offense even more serious, the defendant was not merely passively receiving money that did not belong to him. Instead, he took several affirmative acts over several years to give the appearance that his mother was still alive in order to maintain his fraudulent scheme. In his statement to the PSR writer, the defendant tries to give the impression that he did not plan to continue his scheme for a long period of time, but that he did not know how to bring the scheme to an end. The defendant's words to the PSR writer are belied by his own actions. Indeed, the defendant even went so far as to cancel his mother's health insurance by forging his mother's signature on a Federal Employees Health Benefits form, on or about March 20, 1989, thereby canceling his mother's health insurance. The benefit to the defendant in doing so was to increase the net payment he obtained under his mother's annuity since the costs of his mother's health insurance would no longer be deducted from the annuity payment. The defendant took this action approximately five years after he began his scheme to defraud the government. Contrary to what the defendant told the PSR writer, the defendant's actions suggest he had no intention of putting an end

---

[1]     It should be noted that it is unknown if the defendant wrote checks from other bank accounts for education expenses. After reviewing copies of the personal checks that were written from the defendant's Market Credit Union bank account, it appears that most of the money was spent on living expenses which included utility bills, car loan payments, auto repairs and insurance payments.

to his scam.  What is clear is that the amount of loss to the government would have been even larger but for the government catching the defendant's fraudulent conduct after 21 years.

15.     Although the defendant does not have an extensive criminal history, his criminal record is marred by prior crimes of crimes of deceit and deception and should be considered by the Court.  In 1970, the defendant was convicted of shoplifting.  In 1986, he was arrested for conspiracy to commit theft and deception; and, in 1991, he was arrested for issuing bad checks.  The defendant's criminal history, involving crimes of deception, is consistent with his conduct in the instant case and provides reason for the Court to discount the defendant's version that he wished he could have brought his scheme to an end but did not do so because he found himself in over his head.

16.     The need for deterrence and to protect the public also support the government's recommended sentence of 12 months, plus an award of restitution in the amount of $162,303. Although the government does have substantial resources, those resources are limited.  The cumulative impact on the public of such crimes is that there is less money available for other individuals having legitimate needs.  The need for deterrence requires a sentence that does more than simply require the defendant to pay back the money he stole.[2]  Moreover, the crime committed here is a crime that required deliberation and reflection by the defendant.  Under such circumstances, an individual has the ability to assess the consequences and likelihood that he will get caught and to decide whether he should go forward with committing the crime.  If an individual contemplating such conduct knew that the only penal consequence he would face if caught were probation and an

---

[2]  Title 18, United States Code, Section 3663A provides for mandatory restitution to the victims of certain crimes, including offenses committed, as in this case, against property committed by fraud or deceit. 18 U.S.C. §3663A(c)(1)(A)(ii).  Pursuant to the plea agreement, the defendant has agreed not to oppose an award of restitution in the amount he stole, $162,303.

award of restitution, after stealing thousands of dollars from the government for over 21 years, the individual would have very little, if any, incentive not to commit the crime. The worse case scenario would be that he would have to return what did not belong to him in the first place. The public interest and need for deterrence support the imposition of a jail sentence to prevent future crimes of this magnitude and to ensure that government funds remain available to be spent as the public sees fit.

WHEREFORE, based upon the above discussion, and the information reflected in the presentence report, the United States respectfully recommends a period of 12 months of incarceration, followed by a 2 year period of supervised release, and an award of $162,303.76 in restitution.

Respectfully,

JEFFREY A. TAYLOR
United States Attorney

By: _____/s/_____
PERHAM GORJI
ASSISTANT UNITED STATES ATTORNEY
Federal Major Crimes Section
United States Attorney's Office
555 Fourth Street, N.W., Room 4233
Washington, D.C. 20530
Phone: (202) 353-8822
Fax: (202) 616-3782

CERTIFICATE OF SERVICE

     I hereby certify that a copy of the United States' Memorandum in Aid of Sentencing and Motion for Three Point Reduction was served by first class mail upon counsel of record for the defendant, Harold D. Martin, Esquire, 1140 Connecticut Avenue, N.W., 11th Floor, Washington, D.C. 20036, this 2nd day of February, 2007.


                                                         /s/
                                        PERHAM GORJI, AUSA